UNITED STATES of America, Appellant,

v.

Anthony F. DELGUYD and Santo
Maimone, Appellees.

No. 76–1116.

United States Court of Appeals,
Sixth Circuit.

Argued June 22, 1976.

Decided Sept. 29, 1976.

Rehearing Denied Nov. 1, 1976.

Frederick M. Coleman, U. S. Atty., Cleveland, Ohio, Reuben H. Wallace, Jr., T. George Gilinsky, Sidney M. Glazer, Washington, D. C., for appellant.

Elmer A. Giuliani, Cleveland, Ohio, for Delguyd.

Gerald Gold, Gold, Rotatori, Messerman & Hanna, Robert J. Rotatori, Niki Schwartz, Cleveland, Ohio, for Santo Maimone.

Before WEICK, EDWARDS and McCREE, Circuit Judges.

WEICK, Circuit Judge.

The government has appealed from an order of the United States District Court for the Northern District of Ohio suppressing evidence seized by the FBI as the result of a warrantless entry into the residence of Appellee, Santo Maimone. Although the evidence suppressed had been seized pursuant to a search warrant, the affidavit supporting the application for the warrant contained facts learned by FBI agents when they broke into an apartment in an attempt to prevent the destruction of evidence at a time when it was in the process of being destroyed. Because the question presented requires a determination of whether the situation at the time of the warrantless entry could justify findings of probable cause and exigent circumstances, a lengthy recital of the facts of the case is required.

## I

### THE FACTS

During the course of an investigation of loan sharking activities in the Cleveland area, the FBI ran a wiretap on the telephone of Appellee, Anthony Delguyd. The wiretap was authorized by court order pursuant to 18 U.S.C. §§ 2510–20, and the legality of the wiretap is not being challenged here. Several conversations between Delguyd and Santo Maimone were intercepted and recorded. The conversations were quite guarded, so it is not clear that during the talks they were always discussing loan-sharking activities. Maimone reported to Delguyd that he had made a loan to a girl by the name of Pam; Delguyd discussed a loan to "Johnny Vit"; in other phone conversations Johnny Vitatonio was heard discussing loans with Delguyd; and there was a reference to "a matter of six." It would not be unreason-

able to suspect that they were associated together in the loan shark business.

On the morning of July 15, 1974, the FBI obtained from a magistrate ten search warrants to search various places and persons including the person and residence of Delguyd. Maimone was not a subject of any of the warrants. However, the FBI believed, and apparently with good reason, that Maimone was a confederate of Delguyd, they having observed a prior meeting of Miamone and Delguyd, and having seen Delguyd in the vicinity of Maimone's apartment, and Maimone's car parked at Delguyd's residence, as well as having intercepted the telephone conversations between them. The FBI agents also surmised that if they searched Delguyd's home, he might call Maimone to instruct Maimone to destroy any evidence in his possession concerning their loan-sharking activities. Accordingly, the FBI stationed two agents near Maimone's apartment and continued to monitor Delguyd's phone; they planned to call the agents at Maimone's apartment if Delguyd attempted to call Maimone to order evidence destroyed.

The agents who were to execute the warrant on Delguyd went to his house but he was not there. Later, he arrived at his home but as he began to turn into his driveway, a neighbor waived to him which apparently operated as a signal, and he suddenly turned away and drove off at a high rate of speed as the FBI agents approached him and identified themselves. The agents pursued, but Delguyd drove through red lights and stop signs and eluded them. The agents then alerted other FBI agents including the FBI team staking out Maimone's apartment.

Delguyd did drive to Maimone's apartment complex and stopped his car, where he was confronted by the agents already there. One of the agents noticed that Maimone was watching from the living room window in his apartment; then Maimone disappeared into his apartment. The agents rushed up to the apartment door and after identifying themselves demanded to be admitted. One of the agents heard some rus-

tling and then a toilet being flushed, and they therefore grabbed a sledge hammer and broke down the door. Maimone was in the process of tearing up some papers and flushing them down the toilet. The agents retrieved some papers from the toilet, secured the apartment, left the drying papers in the living room, and went to get a search warrant from a magistrate. They returned with the warrant, searched the apartment, and seized various papers which apparently tended to implicate both Maimone and Delguyd in loan-sharking activities.

In a two-count indictment, Delguyd and Maimone were charged with destroying records to prevent their seizure as evidence by the FBI, in violation of 18 U.S.C. § 2232; and Delguyd was also charged with resisting FBI agents while they attempted to execute the search warrant upon his person, in violation of 18 U.S.C. § 2231.

The District Court held an evidentiary hearing to determine whether it should grant defendants' motions to suppress the evidence seized from Maimone's apartment. This hearing was held after the court had first summarily granted such motions but later had agreed to reconsider, in response to a government request for a hearing. After the hearing, the District Court entered an order to the effect that Delguyd had standing to seek suppression, as well as suppressing the evidence as to both defendants, on the ground that there was neither probable cause nor exigent circumstances to justify the warrantless entry into Maimone's apartment.

The government contests both the District Court's finding of no probable cause or exigent circumstances, and the finding that Delguyd had standing to seek suppression. We shall address the "Standing" issue first.

## II

## STANDING

■ The District Court did not elucidate its accord of standing to Delguyd, stating only that "the Court believes that under the circumstances of this case defendant Delguyd has standing to challenge the searches herein." It would have been helpful had the District Court explained its reasons for not applying the well-known rule most recently announced by the Supreme Court, in *Brown v. United States*, 411 U.S. 223, 229, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973), that a defendant has no standing to contest a search and seizure where he is not on the premises at the time of the search and alleges no proprietary or possessory interest in the premises and is not charged with an offense that includes as an essential element, possession of the seized evidence at the time of the search. As explained in *Alderman v. United States*, 394 U.S. 165, 171–76, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969), Fourth Amendment rights are personal in nature and cannot be vicariously asserted by one whose privacy was not invaded by the search.[1]

■ Delguyd insists that he has standing because he was on the premises at the time of the warrantless entry, or that he would have been in the apartment as an invitee had he not been restrained from entering the apartment by FBI agents in the parking lot. We do not agree that a person can extend the area in which he is entitled to Fourth Amendment protection by demonstrating an intention to visit a particular place.

Delguyd cites the case of *United States v. Fay*, 225 F.Supp. 677 (S.D.N.Y.1963), *reversed on other grounds*, 333 F.2d 28 (2d Cir. 1964), for the proposition that an invitee found outside an apartment has standing to contest a search of the apartment. The facts in that case, however, indicate that the petitioner had become an invitee prior to being accosted by police in the hallway immediately outside the doorway to the apartment; further, that the tenant, although talking on the telephone inside the

1. Delguyd argues that he was a "victim" of the search as the term is used in *Alderman* because he may suffer a conviction if the evidence is used against him. In *Alderman* a victim of a search was considered to be one whose privacy rights were invaded by the search, not merely one who would suffer adverse consequences from the use of the items seized in the search.

apartment, was in plain view because the apartment door was open; and that the petitioner was immediately outside the doorway. The *Fay* decision effectively demonstrates the flexibility of the law in refusing to hinge the question of standing on whether the petitioner was found two feet inside or two feet outside the open doorway to the apartment.

However, Delguyd's argument asks us to extend the on-the-premises principle beyond the breaking point. Delguyd had done no more than enter the parking lot of a large apartment complex. Although his actions created a strong inference that he was on his way to visit Maimone, apparently to advise him to destroy evidence, his destination is irrelevant in determining the scope of his Fourth Amendment rights under *Brown* and *Alderman*. A person found in an apartment parking lot does not thereby gain standing to contest a search of an apartment of someone else in the complex. A visitor does not have any privacy interest as to an apartment unless he is in the apartment.

Delguyd's other major contention in support of granting him standing is that he is entitled to "automatic standing" under the rule of *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). In *Jones*, the Supreme Court held that a person charged with an offense, one element of which is possession of an item at the time of the search, is automatically entitled to standing to contest the legality of the search. This rule was formulated to protect a person's Fifth Amendment right to avoid self-incrimination since otherwise he would have to admit possession in order to establish standing. The necessity for the *Jones* rule was eliminated by the Supreme Court in *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), which held that an admission by a defendant in a suppression hearing could not be used against him at trial. This

Court has subsequently held that *Simmons* eliminated the automatic standing rule of *Jones; United States v. Dye*, 508 F.2d 1226, 1232–34 (6th Cir. 1974), *cert. denied*, 420 U.S. 974, 95 S.Ct. 1395, 43 L.Ed.2d 653 (1975); *United States v. Hearn*, 496 F.2d 236, 240–41 (6th Cir.), *cert. denied*, 419 U.S. 1048, 95 S.Ct. 622 (1974).[2]

In light of the *Simmons* rule, Delguyd could have demonstrated at the suppression hearing a possessory interest in the papers seized from Maimone's apartment. This he did not do, nor does he argue here that he has any possessory interest in the papers seized. He cannot gain standing by claiming that Maimone's papers might incriminate him.

We hold that the District Court erred in granting standing to Delguyd to seek suppression as to him of the fruits of the search of Maimone's apartment.

### III

### PROBABLE CAUSE AND EXIGENT CIRCUMSTANCE FOR WARRANT-LESS ENTRY

The District Court found that the FBI agents did not have probable cause to make a warrantless entry into Maimone's apartment, and that exigent circumstances were not shown. If the FBI agents lacked probable cause and exigent circumstances for the warrantless entry, the evidence seized later under the authority of the search warrant must be suppressed as fruit of the poisonous tree. *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

In order for this warrantless entry to be upheld, there must have been circumstances existing at the time of the search which could lead a person of reasonable caution to conclude both that evidence of a federal crime would probably be found on

---

2. Even if the *Jones* rule were still being applied in this Circuit, Delguyd could not gain automatic standing. Possession of the papers is not an essential element of 18 U.S.C. § 2232 or of 18 U.S.C. § 2. Delguyd was charged with aiding and abetting Maimone in preventing the seizure of items by the authorities. Possession is not an essential element of aiding and abetting another in destroying evidence.

the premises[3] and that such evidence would probably be destroyed were the FBI to take time to seek a warrant.[4]

Prior to the attempt to execute the warrant on Delguyd, the FBI knew that Maimone was an associate of Delguyd who, they had probable cause to believe, was engaged in loan-sharking activities. The FBI had intercepted phone conversations which, though somewhat ambiguous, were certainly suspicious in nature and could reasonably be interpreted as indicating the possibility that loan transactions involving Delguyd and Maimone had taken place. Those phone conversations would only crate suspicions, not probable cause.

On the day of the searches, when the FBI attempted to confront Delguyd in front of his house and he drove off at high speed in an obvious attempt to elude the FBI, his destination was Maimone's apartment. Why did Delguyd consider it so important to reach Maimone before the FBI confronted him, that he would engage in a dangerous high-speed chase through the Cleveland area, committing many serious traffic violations, as well as causing the instant charges detailed in Count One of the Indictment to be filed against him? The District Court did not address this question. We agree with the government that the most probable explanation of this conduct was that Delguyd knew that Maimone possessed evidence that could incriminate Delguyd, and that it was imperative to have Maimone dispose of the evidence before the FBI confronted Maimone or reached the apartment.

While we recognize that other possible explanations for Delguyd's conduct can be proposed, such as the possibility that Delguyd wanted to warn Maimone to leave town, it is not necessary to eliminate all but one possible explanation in order to establish probable cause, so long as the explanation advanced by the FBI agents to support the search appears in all probability to be correct.[5] Loan-sharking is a type of criminal activity in which the perpetrator must be especially concerned about the existence of incriminating evidence because unlike most criminals, the loan shark must keep detailed records of his activities. In the context of this case, the self-preservation explanation is so much more compelling than the brotherly-love explanation that we believe that reasonable men could conclude from the circumstances that Delguyd was attempting to warn Maimone to destroy the loan-sharking records.

This explanation is reinforced by the subsequent events at Maimone's apartment. The FBI agents perceived Maimone observing the confrontation of Delguyd in the parking lot. When they rushed to the apartment, announced their identity and demanded entry, they heard rustling noises and then the toilet being flushed. Once again, while other explanations can be proposed for these events, under the circumstances we find that a reasonable person could conclude from these events that evidence in the apartment was most probably being destroyed.

The conclusion that evidence was probably being destroyed in the apartment not only contributes to the finding of probable cause to believe that evidence existed in the apartment, but also supplies the exigent circumstances necessary to justify a warrantless entry under the preservation-

---

3. This definition of probable cause was derived from *Carroll v. United States*, 267 U.S. 132, 162, 45 S.Ct. 280, 69 L.Ed. 543 (1925); and the probability test is from *Brinegar v. United States*, 338 U.S. 160, 175, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949).

4. Maimone states that the Sixth Circuit has never recognized the "preservation of evidence" rationale as justifying a warrantless search. We believe that such rationale was made binding on this Court by the Supreme Court in *Roaden v. Kentucky*, 413 U.S. 496,

505, 93 S.Ct. 2796, 2802, 37 L.Ed. 757 (1973), stating:

> Where there are exigent circumstances in which police action literally must be "now or never" to preserve the evidence of the crime, it is reasonable to permit action without prior judicial evaluation.

5. See *Brinegar v. United States*, 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949), wherein the Court stated: "in dealing with probable cause . . . we deal with probabilities."

of-evidence rationale. We note that the FBI agents who entered the apartment confined their activities to those necessary to preserve evidence, and did not otherwise search the apartment until a warrant was obtained. We do not find in these circumstances an attempt by the FBI to go on a fishing expedition under the guise of an exigent-circumstance search.

The District Court attached considerable significance to its finding that the government never established probable cause to believe that Maimone was in the loan-sharking business. It was not necessary to show that Maimone was connected with the loan-sharking business in order to search his apartment. It was only necessary to show probable cause to believe that evidence of someone's loan-sharking activities was present in Maimone's apartment. We believe that the circumstances leading up to the warrantless entry, including Delguyd's desperate flight to Maimone's apartment established probable cause to believe that evidence of Delguyd's loan-sharking activities was present in Maimone's apartment. It would have been helpful to the government's case to have shown positively that Maimone was a loan shark but it was not an indispensable item of proof. The District Court also found that the government failed sufficiently to connect Maimone with the apartment prior to the warrantless entry. This finding was erroneous in view of the fact that the FBI agents saw Maimone standing in the window of the apartment

prior to the warrantless entry. He had also been seen there on earlier occasions.[6]

We hold that the District Court erred in holding as a matter of law that the facts before it did not establish probable cause and exigent circumstances to justify a warrantless entry. Therefore we find that the District Court erred in suppressing the evidence seized in executing the subsequent search warrant.

The order of the District Court suppressing evidence is reversed.

McCREE, Circuit Judge (dissenting in part and concurring in part).

I respectfully dissent from that part of the opinion that reverses the order suppressing the evidence with reference to Maimone.

At the government's request for reconsideration of the district court's initial grant of the motion to suppress, the court held a full evidentiary hearing and reaffirmed its earlier determination. In his Memorandum and Order, Judge Green stated, "Based upon the entire record, the Court finds that the prosecution has failed to sustain its burden of proof of exigent circumstances."

The district court issued a memorandum opinion and did not make detailed findings of fact and conclusions of law. Accordingly, on review we should apply our circuit standard recently stated in *United States v. Upthegrove*, 504 F.2d 682, 686 n. 8 (6th Cir.

---

**6.** We have difficulty in following the reasoning in the dissent. It states that the District Judge in his memorandum opinion did not make detailed findings of fact and conclusions of law on the issue of probable cause and exigent circumstances for the warrantless entry. Particularly, it states:

> The critical finding that the trial judge failed to make was whether or not he credited the testimony of the agents that they heard the toilet flushing and something rustling just before they broke into Maimone's apartment.

The fact is that the testimony of the FBI agents that they heard the rustling noises and the flushing of the toilet was uncontroverted. It was not necessary for the District Judge to make findings on uncontroverted testimony. Any finding of the Judge to the contrary would

not have been supported by substantial evidence and would have been clearly erroneous. The testimony of the agents was corroborated by the fact that they retrieved some of the incriminating papers from the toilet after they gained entrance into Maimone's apartment.

The agents did not proceed hastily. They first knocked on the door and announced their identity after they heard the rustling noises and the flushing of the toilet. When there was no response the agents used a sledge hammer, as it was necessary to break in the door. Upon the entry all that the agents did was to retrieve from the toilet the incriminating evidence which Maimone was attempting to destroy, and to guard the apartment to prevent further destruction of evidence while other agents were procuring from a Magistrate a warrant to search the apartment.

 

1974): when the trial judge has made only limited findings, the reviewing court will "take that view of the evidence which is reasonable and which supports his ruling." This approach is similar to the one to be followed by a reviewing court in considering a contention that a case was improperly submitted to a jury. *See Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 696, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962).

I disagree with the majority opinion because it adopts a course contrary to our circuit rule. The critical finding that the trial judge failed to make was whether or not he credited the testimony of the agents that they heard the toilet flushing and something rustling just before they broke into Maimone's apartment. On this record, neither a finding crediting this testimony nor one discrediting it would have been clearly erroneous. A finding crediting the agents would have undermined his conclusion that the government did not prove exigent circumstances, and a finding discrediting their testimony would support his ruling. Nevertheless, the majority opinion implicitly assumes that the trial judge credited their testimony, and then holds that he erred in determining that there were no exigent circumstances.

The agents admittedly lacked probable cause when they arrived, armed with a sledge hammer, at the closed exterior door of Maimone's apartment. Under the *Upthegrove* standard, the majority opinion should have presumed that Judge Green did not believe that the agents had heard "rustling noises" and "what sounded to me like a toilet flushing" *before* they broke down the door and entered the apartment. Judge Green had the full benefit of demeanor

evidence in assessing the testimony. And he characterized his ruling as a finding,[1] which implies a determination of fact rather than one of law.

Without the sound of something rustling and a toilet flushing, there is an absence, not only of probable cause, but also of exigent circumstances for the search of Maimone's apartment.

I agree with the holding of the majority opinion that Delguyd lacked standing to challenge the search of Maimone's apartment.

---

[1]. The majority opinion states that because the testimony that the sound of a toilet flushing was heard through the locked door was undisputed, it would have been clearly erroneous to have found to the contrary. This might be true were there no evidence at all to discredit this testimony. However, a trial judge, unlike a reviewing court, has the benefit of demeanor evidence in assessing the credibility of witnesses. Furthermore, in this case, it is admitted in the record that the agents carried the sledge

hammer to Maimone's door on first entering the building. The trial court could have inferred that they were then prepared to break down the door, although at that time they did not yet have cause to believe that a warrantless forced entry was justified. The court could further have believed that the testimony about hearing the toilet flushing before entry was an unintentionally inaccurate reconstruction of the sequence of events, made after the agents had seen the papers in the toilet.